53119

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF MISSISSIPPI
# DELTA DIVISION

**HARRY CLIMER,**

    **Plaintiff,F**

**v.**                                                                 **Civil No. 2:12-cv-00047-DMB-JMV**

**HARRAH'S ENTERTAINMENT, INC.,**        **JURY DEMANDED**
**HARRAH'S OPERATING COMPANY,**
**INC. AND ROBINSON PROPERTY**
**GROUP CORP.,**

    **Defendants.**

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ROBINSON PROPERTY CROUP CORP.'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Harry Climer, by and through counsel, submits this Memorandum of Law in Opposition to Defendant Robinson Property Group Corp.'s Motion For Summary Judgment. The Defendants' motion should be denied because there are multiple disputed, material and substantial facts which create questions for the jury and render summary judgment inappropriate. In support of his response, Mr. Climer states:

### FACTS

In this employment discrimination case, Mr. Climer alleges that Horseshoe Casino[1] terminated him in November 2010 because of his age, perceived disability, and association with

---

[1] Robinson Property Group will be referred to as "Horseshoe" throughout the entirety of this response. In the course of discovery, the names "Horseshoe", "Harrah's" and "Robinson Property Group" had been used interchangeably as Mr. Climer's employer. Ricky Busey, Regional Vice-President of Management at Caesars Midsouth explained the formal relationship of the entities: "Robinson Property Group is a subsidiary of Horseshoe properties which is a subsidiary of Caesars Entertainment Operating Company which is a wholly owned subsidiary of Caesars Operating Companies." (Ricky Busey Dep. 8:1- 9:19). Everyone who works at Horseshoe is employed by Robinson Property Group. (Busey Dep. 14:21-15:3).

his disabled wife in violation of the Age Discrimination in Employment Act ("ADEA", Americans with Disabilities Act/Americans With Disabilities Act Amendments Act ("ADA/ADAAA") and 42 U.S.C. § 1981. (Compl. at D.E. #1).

A. Prior Employment

In 2007, immediately prior to becoming employed with Horseshoe, Mr. Climer worked at a local electronics shop, VHS 1, where he repaired electronics, televisions, and could fix almost anything electrical. (Ex. A - Harry Climer Dep. 19:25-20:11). Mr. Climer did not own the shop. (Climer Dep. 20:10-11). During Mr. Climer's employment, the shop closed because its owner was dying with lung disease. (Climer Dep. 20:25-21:2). After the shop closed, Horseshoe contacted Mr. Climer about coming to work at Horseshoe. (Climer Dep. 20:12-24).

B. Horseshoe Recruitment and Hire

George Byers was the Regional Vice President of Facilities at Horseshoe in 2007. (Ex. B - George Byers Dep. 7:7-12). He was responsible for the day-to-day operations of all the facilities, heating, air, kitchen and hotel services at Horseshoe and Sheraton Casinos in Tunica. (Byers Dep. 8:16-9:12). Mr. Byers' immediate subordinate was Robert Copous, the Facilities Manager. (Byers Dep. 13:18-14:1). Mr. Copous wanted Mr. Climer to work as a television mechanic[2]. (Byers Dep. 22:17-19).

Mr. Byers met with Mr. Copous and Mr. Climer for Mr. Climer's initial interview. (Byers Dep. 25:10-13). Mr. Climer told Mr. Byers and Mr. Copous that he was no longer employed and that he was making "X" at his former employer, and needed at least "X" to work at Horseshoe.

---

[2] The Defendant has suggested that some testimony that may be relied upon by Mr. Climer is inadmissible hearsay. Both Mr. Byers and Mr. Copous worked in Horseshoe's employee supervision and management. Any statement by Mr. Byers and Mr. Copous is admissible as a statement of a party opponent as they both are agents of Horseshoe in their actions toward Mr. Climer. Further, this is not hearsay but instead a statement of Mr. Byer's present sense and impression derived from his interaction with Mr. Copous.

(Byers Dep. 25:14-26:2). Ricky Busey, the Regional Vice-president of Management at Caesars Midsouth's[3] (Ex. C - Ricky Busey Dep. 6:15-21), only participation in the decision to hire Mr. Climer was the determination of job title. (Busey Dep. 17:11-24). According to Mr. Busey, Mr. Climer had his own business or he did TV repair and he wanted a rate of pay higher than the pay grade for a facilities engineer and that he could only be hired into the lead category. (Busey Dep. 17:11-24). Mr. Busey asserts that there is an overlap in pay scales and in a lot of cases the minimum of a grade overlaps at the maximum of the previous grade. (Busey Dep. 51:11-53:1). Mr. Byers recalls that the pay range Mr. Climer requested was "in range for low range, mid low to mid range" for what the average mechanic made at Horseshoe. (Byers Dep. 26:3-7). Mr. Climer's employment application says that he made $680.00 a week at VHS 1 (Climer Dep. Ex 2) which is equivalent to $17.00 an hour in a 40 hour work week.

Robert Copous hired Mr. Climer as a television repairperson (Byers Dep. 13:13-14:1,5-14) on July 24, 2007. Mr. Climer's starting pay was set at $17.50. (Byers Dep. 15:16-18; Ex 1). Base rates for other maintenance engineers[4] over time include:

| Name | Base Rate | Adj. Date of Hire | Seniority Date |
| --- | --- | --- | --- |
| Harshman | 19.0550 | 8/30/2005 | 3/25/2007 |
| Climer | 19.6790 | 7/24/2007 | 7/24/2007 |
| Green | 16.8946 | 8/21/2007 | 8/21/2007 |
| Parnell | 18.0000 | 10/13/2009 | 10/13/2009 |
| Smith | 19.5000 | 3/8/2010 | 3/8/2010 |
| Tucker | 19.5000 | 6/7/2010 | 11/20/2010 |

---

[3] Mr. Busey oversees all human resources functions for the three Robinson Property Group properties in Tunica. (Busey Dep. 7:19-24).
[4] Horseshoe began using the term "engineer" instead of "mechanic" after Caesar's purchased Harrah's.

3

| Derrington | 19.0000 | 7/12/2010 | 7/12/2010 |

(Busey Dep. Ex. 3. at D0400). Mr. Climer's pay, even with increases, is comparable to other facilities mechanics who were hired after him and who had shorter periods to accumulate pay increases.

As a repairman, Mr. Climer was assigned to the facilities/engineering department as a "mechanic." (Byers Dep. 16:2-13, 16:20-17:3, 18:19-19:3, 21:22-24, Ex. 1). Mr. Climer installed and repaired televisions. (Byers Dep. 19:4-6). Although Mr. Climer specifically focused on repairing televisions, Mr. Climer was still called a "mechanic." (Byers Dep. 16:10-13). In Horseshoe, all special trades are called "mechanics." (Byers Dep.16:14-19). The mechanic trades included carpenters, painters, plumbers and electricians. (Byers Dep. 16:14-19).

Horseshoe also produced a Lead Facilities Engineer job description that they said is applicable to Mr. Climer. (Busey Dep. 21:8-12, Ex. 3; Ex. D – Robinson Property Group Corp.'s Resp. to P's 1st Set of Interr., No. 6.). Mr. Busey, however, does not know whether Mr. Climer was given a copy of the job description. (Busey Dep. 30:6-16). Mr. Busey does not have personal knowledge of any jobs performed by Mr. Climer because Mr. Climer "was far removed from reporting" to Mr. Busey. (Busey Dep. 27:22-28:11). According to Mr. Busey, Mr. Climer's manager or vice president would be in the best position to know whether Mr. Climer performed the Facilities Lead functions. (Busey Dep. 28:12-20). Mr. Busey acknowledges that Mr. Climer was initially classified as a Facilities mechanic. (Busey Dep. 18:8-20).

When Mr. Byers worked at Horseshoe, there were approximately sixty four mechanics at Horseshoe. (Byers Dep. 20:6-20). Mr. Byers had two leads, Tommy Stovall and Willie Lee. (Byers Dep. 20:21-21:15). Mr. Climer was hired as a mechanic. (Byers Dep. 21:16-24). Mr.

Climer was not a lead. (Byers Dep. 21:16-24). He did not have supervisory duties. (Byers Dep. 20:1-3). He did not supervise any employees. (Ex. E - Jeff Rich Dep. 14:5-6). He did not have people working for him. (Byers Dep. 20:4-5).

C. Salary Raise

In April 2008, the facilities manager requested to give Mr. Climer as raise. (Byers Dep. 17:15-18:4, Ex. 2). Per the request, Mr. Climer's pay was increased from the original $17.50 an hour to $18.50 an hour. (Byers Dep. Ex. 2). The rationale for the raise states:

> Harry began working with Horseshoe facilities as a TV mechanic (specifically in the SA/V areana) [sic] and in his short tenure he has progressed to repairs and installs at both the Sheraton and Grand properties. This request is to give Harry a salary adjustment to scale. We are very lucky to have this quality of skill available to us and I am sure we are seeing cost effectiveness by not having to outscorce [sic] TV repairs.

(Byers Dep. Ex. 2). The documentation supporting the raise explicitly states, "Salary Change ONLY." (Byers Dep. Ex. 2). No promotion or position change was requested for Mr. Climer.

D. Job Performance and Duties

Charles Lebo was one of Mr. Climer's coworkers at Horseshoe. Mr. Lebo has known Harry Climer approximately 25-30 years. (Ex. F - Charles Lebo Dep. 13:12-14). Mr. Lebo worked as a kitchen mechanic. (Lebo Dep. 8:12-13). As a mechanic he worked on refrigerators, stoves, ovens, general plumbing, electric, and performed general electric work in the kitchen. (Lebo Dep. 8:16-19). According to Mr. Lebo, there were approximately 35 people in Facilities when Mr. Climer worked at Horseshoe. (Lebo Dep. 16:2-5). The facilities maintenance employees worked in electrical, plumbing, moving furniture, general building maintenance. (Lebo Dep. 16:9-18).

Mr. Lebo affirms that Mr. Climer was not a lead mechanic. (Lebo Dep. 17:10-12). No one ever to Mr. Lebo that Mr. Climer was a lead mechanic. (Lebo Dep. 17:17-18:3). Mr. Climer

5

never told Mr. Lebo that he was a lead mechanic. (Lebo Dep. 17:14-16). Mr. Lebo was aware that Mr. Climer did not have assistants to help him do his work. (Lebo Dep. 14:9-13). Because Mr. Climer did not have assistants, Mr. Lebo helped Mr. Climer hang televisions at Horseshoe. (Lebo Dep. 13:15-23). Mr. Lebo observed that after Mr. Climer's termination, Horseshoe retained in its employment maintenance employees who were younger than Mr. Climer. (Lebo Dep. 27:12-17).

Jeff Rich was a Facilities Manager at Horseshoe Casino. (Rich Dep. 8:17-9:5). Mr. Rich also spent time as a mechanic and a supervisor. (Rich Dep. 9:6-16). As a mechanic Mr. Rich worked on equipment. (Rich Dep. 9:7-9). As a supervisor, Mr. Rich oversaw the crew, lined out the crew's daily work, ordered parts, and assisted the newer crew with problems they encountered. (Rich Dep. 9:13-16). As the Facilities Manager, Mr. Rich watched over the budget and assisted the crew on problems. (Rich Dep. 9:17-20). Mr. Rich was still a supervisor when Mr. Climer worked at Horseshoe. (Rich Dep. 9:21-10:2).

Mr. Rich recalls that Mr. Climer was previously employed at a television shop that repaired Horseshoe's televisions. (Rich Dep. 10:3-10). When the television shop closed, Mr. Byers hired Mr. Climer to work for Horseshoe repairing televisions. (Rich Dep. 10:3-10). Mr. Rich described Mr. Climer as a television mechanic who had expertise in electronics. (Rich Dep. 13:20-14:4). Everybody in Horseshoe's Facilities Department was considered a mechanic. (Rich Dep. 26:16-18, 27:7-10).

As a supervisor, Mr. Rich was responsible for evaluating Mr. Climer's performance. Performance includes the employee's attitude, workmanship, and skill. (Rich Dep. 29:12-17). According to Mr. Rich, Mr. Climer was "good at what he did." (Rich Dep. 27:11-13). Mr. Climer's performance was evaluated as a "mechanic", not as a "lead mechanic." (Rich Dep.

6

26:22-27:10, Ex. 2). In the first six months of employment, Harry Climer was rated "consistently meets expectations." (Rich Dep. 27:14-16, Ex. 2). Mr. Climer's performance rating improved over time. (Rich Dep. 28:16-29:3, Ex. 3). His performance score improved with each successive performance evaluation. (Rich Dep. 29:2-11, Ex. 4). The improving trend continued until the second six months performance evaluation of 2010. (Rich Dep. 29:18-30:9). In this period, Mr. Rich reduced Mr. Climer's rating to "consistently meets" expectations. (Rich Dep. 29:18-30:9, Ex. 5). Mr. Rich gave Mr. Climer a lower score because he "might have been out a lot." (Rich Dep. 29:21-30:9). Mr. Rich said that he still would have reduced Mr. Climer's performance rating even knowing that Mr. Climer was off of work for medical reasons. (Rich Dep. 30:11-22). Mr. Climer was out on FMLA leave during this period (See Climer Dep. Exs. 25-26) to take care of his wife. His wife had multiple medical conditions, which included coronary artery disease and hip fractures, which required Mr. Climer's attention and care. (Climer Dep. Ex. 25). Mr. Rich, as a supervisor, sent the information regarding his employee's attendance (Rich Dep. p. 22, l.18-24) and medical leave (Rich Dep. 23:1-6) to Horseshoe's human resources.

E. Termination

Horseshoe terminated Mr. Climer on November 10, 2010. (Busey Dep. 33:15-22). Mr. Busey and the facilities director, Randy Wooten made the decision to terminate Mr. Climer. (Busey Dep. 33:20-34:7). Mr. Wooten knew that Mr. Climer would be out of work for at least six weeks due to an injury that he sustained two years earlier (September 23, 2008). (Ex. G – Status Change D0151).

Mr. Busey explained the termination process. At the time there were approximately 45 facilities maintenance personnel. (Busey Dep. 37:16-18). Allegedly there were three facilities leads. Mr. Busey and Mr. Wooten decided that they would terminate all but one of the facilities

7

leads. (Busey Dep. 34:3-35:4). At the time, Mr. Wooten and Tunica Regional Human Resources personnel had knowledge that Mr. Climer was out of work for a persistent injury. (Ex. G). Human resources pulled the data from everyone in Mr. Climer's alleged job classification to prevent anyone from being able to pick and choose who were the highest performers or who had the highest seniority. (Busey Dep. 44:12-45:10). If Mr. Climer was the most recently hired of three lead engineers as Horseshoe alleges, Mr. Wooten would have known that Mr. Climer would be eliminated if Horseshoe was to eliminate two of the existing three leads.

Mr. Byers said that Horseshoe compared Mr. Climer against the Lead Facilities Engineers and did not take any of their specialties into account in the comparison. (Busey Dep. 40:5-21, 43:2-10). If this is true, the comparison should have been skill set neutral, without regard to the availability of work for any special skill set. Mr. Busey alleges that Mr. Climer's performance did not play into the decision because Mr. Climer was the least senior lead and had the same performance rating as the other lead that was also eliminated. (Busey Dep. 43:11-17). Mr. Busey also alleges that the decision was made to terminate Mr. Climer was because he was the least senior of three engineering leads in his department. (Busey Dep. 47:10-13). Mr. Busey and Mr. Wooten relied on the description within the human resources system at the time of the data pull which showed Mr. Climer as a maintenance engineering lead. (Busey Dep. 48:2-9). Mr. Climer's performance evaluations listed him as a 'mechanic" giving Mr. Busey and Mr. Wooten sufficient notice that Mr. Climer was not working as a lead.

Mr. Rich recalls that there were approximately thirty employees in Facilities when Horseshoe terminated Mr. Climer. (Rich Dep. 14:23-15:30). The facilities employees had jobs performing electrical, plumbing, kitchen equipment repair and other work. (Rich Dep. 15:14-17). Even with his direct supervisory duties over Mr. Climer, Mr. Rich did not find out that human

resources had called Mr. Climer a lead until the morning that Mr. Climer was terminated. (Rich Dep. 16:1-6). Prior to that date, Mr. Rich had never considered Mr. Climer a lead. Mr. Rich knew Mr. Climer was not a lead because, "Well, I mean, Harry wasn't actually in a supervisal [sic] role." (Rich Dep. 16:7-10). Mr. Climer would not have been considered "a lead engineer." (Rich Dep. 16:18-19).

Mr. Rich, Mr. Wooten and an individual from human resources were present when Mr. Climer was terminated. (Rich Dep. 21:22-22:6). Mr. Wooten told Mr. Rich that human resources made the decision to terminate Mr. Climer and that there was nothing they could do about it.[5] (Rich Dep. 20:11-24). Horseshoe still needed a television repairman after Climer's termination. (Rich Dep. 32:7-11). Mr. Rich talked to Mr. Wooten on several occasions about bringing Mr. Climer back to work. (Rich Dep. 32:7-13). After the termination Randy Wooten told Mr. Climer, "Harry, we hate that we're losing you. Maybe in the future, we might could work out something where you could continue to do it like a subcontractor." (Rich Dep. 23:7-20). Horseshoe called in an outside vendor to repair televisions after Mr. Climer was fired. (Rich Dep. 20:14-23).

Horseshoe maintained the employment of persons in facilities who were younger than Mr. Climer, even after Mr. Climer was terminated. (Rich Dep. 24:21-25:1). Horseshoe maintained the employment of persons in facilities who were hired after Mr. Climer. (Rich Dep. 25:9-14). As a supervisor, Mr. Rich would know whether the other employees were younger or had less seniority. Mr. Climer was capable of performing other roles in facilities, including dispatcher. (Rich Dep. 32:14-33:8).

Mr. Lebo visited Mr. Climer at his house in the last year. (Lebo Dep. 25:20-22). In Mr. Lebo's visits with Mr. Climer, the lawsuit was always mentioned. (Lebo Dep. p. 26, ll. 3-14).

---

[5] The statement is a statement by a party opponent, the agent of Horseshoe. It is not being offered for the truth of the matter asserted.

Mr. Lebo said he did not recall conversations with Mr. Climer regarding his termination. (Lebo Dep. 23:4-6). He did not say that the conversations did not occur. Mr. Climer recalls that Mr. Lebo called him while Mr. Climer was out for surgery and told Mr. Climer that Mr. Rich was talking about letting 11 people go. (Climer Dep. 68:23-69:11). The final decision was to let Mr. Climer and Mr. Lee go because they were the oldest there and because both had been hurt. Id; 70:23-71:9). Mr. Lebo called Mr. Climer while he was in rehab and told him that the termination papers were already written up. (Climer Dep. 47:16-48:2). Mr. Lebo's testimony is admissible under Fed.R. Evid. 803(1) as his present sense and impression of Horseshoe's plan to terminate employees as it was in progress. It is also admissible under Fed.R. Evid. 804(a)(3) and 804(b) as statement against his interest in continued employment with Horseshoe. In preparation for his deposition, Mr. Lebo met with Horseshoe's attorney, Caesars' Regional Vice-President of Management, and another person from human resources for 40 minutes. (Lebo Dep. p. 28, ll. 16-p. 29, l. 10). After the meeting, Mr. Lebo recanted much of what he previously told Mr. Climer. Mr. Rich's statements are statements by the agent of a party-opponent concerning a matter within the scope of the agency or employment.

## The Essential Elements of Mr. Climer's ADA Claim Are Met

The standard the Fifth Circuit articulated for reduction in force cases requires a plaintiff to show that (1) he is within the protected age group, (2) he has been discharged or demoted, (3) he was qualified to assume another position at the time of the discharge or demotion, and to (4) produce circumstantial or direct evidence from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the discharge issue. Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 812 (5th Cir. 1991). It is sufficient to meet the last element by

10

showing that an allegedly less qualified younger employee was retained during the reduction in force. Amburgey, 936 F.2d at 812.

> What is suspicious in reduction-in-force cases is that the employer fired a qualified, older employee, but retained younger ones. If we focus . . . on why the plaintiff rather than another employee was discharged, the discharge of an older employee rather than a younger one is initially unexplained. Under these circumstances, requiring the employer to articulate reasons for his decision to fire the plaintiff is appropriate."

Id. at 812-813.

Mr. Climer can establish all four elements of a prima facie case of age discrimination. Mr. Climer is in the protected group. He was 61 years old when he was terminated. Termination is an adverse employment action. Mr. Climer was qualified to assume another position at the time of discharge. The defendant alleges that Mr. Climer was Lead Facilities Engineer. If Mr. Climer was qualified to be a Lead Facilities Engineer, it logically follows that he was more qualified than the remaining employees who held subordinate facilities mechanic positions.

Both the vice president of facilities and Mr. Climer's supervisor testified that a specific skill set is not required for assignment to a facilities mechanic position. (Rich Dep. 26:16-18, 27:7-10). Facilities mechanics included electricians (Byers Dep. 16:14-19; Lebo Dep. 16:9-18), a skill set Mr. Climer was known to possess. Mr. Climer was skilled in electronics and could have worked on any electrical equipment. (Rich Dep. 13:20-14:4). Above that, he was especially skilled in television repair. (Rich Dep. 13:20-14:4).

It is a question of fact as to whether Mr. Climer was a Lead Facilities Engineer as alleged by Horseshoe. Horseshoe takes two contradictory positions. Human resources said that Mr. Climer was a Lead Engineer and relied on a job description that does not accurately describe Mr.

11

Climer's job functions. (Busey Dep. 21:8-12, Ex. 3; Ex. D). Caesars' Regional Vice-President of Management also said that Mr. Climer's supervisor and vice president are in the best position to determine what duties Mr. Climer actually performed. (Busey Dep. 28:12-20). The vice president and supervisor both stated that Mr. Climer was a mechanic and not a lead. (Byers Dep. 16:2-13, 16:20-17:3, 18:19-19:3, 21:22-24, Ex. 1; Rich Dep. 13:20-14:4, 16:7-10, 16:18-19).

    Mr. Climer should have never been included in the reduction in force in the first place. Mr. Climer was hired as a facilities mechanic. (Byers Dep. 16:2-13, 16:20-17:3, 18:19-19:3, 21:22-24, 22:17-19, Ex. 1; Busey Dep. 18:8-20; Lebo Dep. 17:17-18:3; Rich Dep. 13:20-14:4, 16:1-10). Neither he, nor his superiors, or peers were advised that he would be considered a lead. (Busey Dep. 19:1-4; Byers Dep. 16:2-13, 16:20-17:3, 18:19-19:3, 21:22-24; Rich Dep. 13:20-14:4, 16:1-10; Lebo Dep. 17:10-12). Mr. Climer received performance evaluations as a facilities mechanic. (Rich Dep. 26:22-27:10, Exs. 2-5). During the reduction in force, human resources allegedly compared Mr. Climer's performance only to Lead Facilities Engineers. (Busey Dep. 40:5-21). In the course of the comparison they should have noticed that all of Mr. Climer's performance evaluations identified him as a "mechanic." (See Rich Dep. 26:22-27:10, Exs. 2-5). Had Horseshoe applied the reduction in force according to the position Mr. Climer was known to occupy by his immediate supervisors and peers, he would not have been a part of the reduction in force at all. He would have only been considered in a reduction in force applied to other facilities mechanics like him. When considered against other facilities mechanics, there were other younger mechanics with less seniority (Rich Dep. 24:21-25:1, 25:9-14; Lebo Dep. 27:12-17) that could have been terminated instead of Mr. Climer.

    Human resources provided another reason why Mr. Climer should not have been considered for reduction in force in a group of three. Mr. Busey said that Horseshoe assigned Mr.

Climer's position as Lead Facilities Engineer, not because of the job duties he performed, but because Mr. Climer wanted to make a wage comparable to his wage at a previous employer. (Busey Dep. 17:11-24). If this is true, which Mr. Climer denies, the job title assigned by Horseshoe, whether it be Lead Facilities Engineer or Facilities Mechanic, can have no legitimate distinction in practice. If Horseshoe can arbitrarily make Mr. Climer a lead for pay purposes only, it stands to reason that Horseshoe's job titles are meaningless and Horseshoe had no legitimate reason to segregate Lead Facilities Engineers in a reduction in force. Without a legitimate distinction between jobs, Horseshoe should have considered all of its facilities employees in the reduction in force. A consideration of all facilities employees, makes sense in the context of Mr. Lebo's statement that Mr. Rich was considering letting 11 people go. (Dep. Lebo 68:25-69:11). Rather than apply the data pull to the entire group of facilities mechanics, Horsehoe grouped the three oldest employees together and with the intent of terminating two of the three, a result that would predictably select Mr. Climer based on his known lack of seniority.

Prior his termination, Mr. Climer was told by Mr. Lebo that his supervisor "was going to let me go – they were going to let me go because of my age and because I had gotten hurt." (Climer Dep. 47:1-13). Mr. Climer's supervisor and a coworker confirmed that employees who were younger and less senior than Mr. Climer were retained in the reduction in force. (Rich Dep. 24:21-25:1, 25:9-14; Lebo. Dep. 13:15-23).

The above facts demonstrate that Mr. Climer has met each of the requirements to establish a prima facie case of age discrimination.

Whether Horseshoe hired a younger person to repair televisions does not determine whether the prima facie case its met. Mr. Busey testified that the decision to terminate Mr. Climer was based on seniority and performance. The actual job duty, television repair in Mr.

13

Climer's case, was not a consideration in the termination decision. (Busey Dep. 40:5-21, 43:2-10). To the extent that Horseshoe suggests that changes in television repair practices was a legitimate reason for terminating Mr. Climer, Mr. Rich contradicts that assertion. Mr. Rich talked to Mr. Wooten on several occasions about bringing Mr. Climer back to work because they needed a television repairman. (Rich Dep. 32:7-13).

After the termination Randy Wooten told Mr. Climer, "Harry, we hate that we're losing you. Maybe in the future, we might could work out something where you could continue to do it like a subcontractor." (Rich Dep. 23:7-20). Instead of rehiring Mr. Climer, Horseshoe called in an outside vendor to repair televisions after Mr. Climer was fired. (Rich Dep. 20:14-23). Mr. Lebo told Mr. Climer that Horseshoe had "a young guy come down there and pick the TV's up and take them somewhere and work on them." (Climer Dep. 75:24-25,76:1-7). Horseshoe responses to interrogatories say that they had televisions repaired on site. (Ex. D – Robinson Property Group Corp.'s Resp. to P's 1st Set of Interr., No. 6). Horseshoe changed the answer in the deposition to say they did not really repair televisions on site. (Busey Dep. 49:10-50:14). The statements are contradictory. Whether Horseshoe continued to conduct the kind of television repairs Mr. Climer conducted while employed at Horseshoe is a question for the jury.

Mr. Climer's testimony that the Facilities Manager was "told that they could let, you know, a couple of [younger] dispatchers go or whatever and keep [Climer]" (Climer Dep. 76:14-23) is admissible. That statement was made by Jeff Rich, Mr. Climer's supervisor and an agent of Horseshoe, a party opponent. Mr. Rich's testimony is admissible under Fed.R. Evid. 803(1) as his present sense and impression of Horseshoe's plan to terminate employees as it was in progress. The statement was told to Mr. Climer by Mr. Lebo. Mr. Lebo said he did not recall conversations with Mr. Climer regarding his termination. (Lebo Dep. 23:4-6). He did not say

14

that the conversations did not occur. Mr. Climer recalls that Mr. Lebo called him while Mr. Climer was out for surgery and told Mr. Climer that Mr. Rich was talking about letting 11 people go. (Climer Dep. 68:23-69:11). Mr. Lebo's testimony is admissible under Fed.R. Evid. 803(1) as his present sense and impression of Horseshoe's plan to terminate employees as it was in progress. It is also admissible under Fed.R. Evid. 804(a)(3) and 804(b) as statement against his interest in continued employment with Horseshoe.

The dispatchers at issue were under the direction of Randy Wooten, a participant in Mr. Climer's termination. These dispatchers were initially being considered in the reduction in force, until Mr. Wooten and Mr. Busey restricted the criteria for reduction in force group to the three oldest employees in facilities. Mr. Busey and Mr. Wooten did not consider the actual job duties performed when lumping Mr. Climer in with the Facilities leads and likewise cannot now rely on separate job duties to distinguish Mr. Climer from dispatchers who were also in Facilities. Mr. Climer's testimony that the dispatchers were "young" is sufficient to establish that the dispatchers were not old in age. (Climer Dep. 70:15-17).

Horseshoe's proffered legitimate, non-discriminatory, and non-retaliatory reason for terminating Mr. Climer is unsubstantiated. Horseshoe asserts that Mr. Climer had a lower performance rating than Stovall who had a highly successful rating. (D.E. #53 at 263). Mr. Climer's performance evaluation was downgraded for a discriminatory reason, his missing work for FMLA leave. (Rich Dep. 29:21-30:9, 30:11-22; <u>See</u> Climer Dep. Exs. 25-26). Had Mr. Climer not missed work, his performance trend would have continued on the previous increasing trend. (<u>See</u> Rich Dep. Exs. 2-4)(increasing performance trend). As discussed earlier in this response, Mr. Climer was not regarded as a maintenance engineering lead and was not evaluated as a maintenance engineering lead. (Rich Dep. 16:7-10, 26:22-27:10, Exs. 2-5; Byers Dep.

15

21:16-24). Thus, Mr. Climer was lumped into a group of the oldest employees for purposes of the reduction in force under the false pretense that he was a Lead. Had he been lumped in with non-lead maintenance engineers, there would have been younger and less senior engineers ranked against Mr. Climer (Rich Dep. 24:21-25:1; Lebo Dep. 27:12-17) for termination.

Mr. Busey could not have held an honest belief that Mr. Climer was a maintenance engineering lead at the time he made the decision to eliminate Mr. Climer's position. Even if Mr. Climer, Mr. Lee and Mr. Stovall were classified as maintenance engineering leads in Horseshoe's Human Resources Information system as Mr. Busey alleges (Busey Dep. 34:4-20, 39:24, 40:1-21), Mr. Busey review of Mr. Climer's performance should have alerted him to Mr. Climer's evaluation as a "mechanic." (Rich Dep. Exs. 2-5). Neither Mr. Busey nor Mr. Wooten did anything about the discrepancy.

Mr. Climer Established the Essential Elements of His Disability Claim

Horseshoe regarded Mr. Climer as disabled and terminated him when he returned to work after a rehabilitating injury. Prior his termination, Mr. Climer was told by Mr. Lebo that his supervisor "was going to let me go – they were going to let me go because of my age and because I had gotten hurt." (Climer Dep. 47:1-13). Mr. Climer recalls that Mr. Lebo called him while Mr. Climer was out for surgery and told Mr. Climer that Mr. Rich was talking about letting 11 people go. (Climer Dep. 68:23-69:11). The final decision was to let Mr. Climer and Mr. Lee go because they were the oldest there and because both had been hurt. Id; 70:23-71:9). Mr. Lebo called Mr. Climer while he was in rehab and told him that the termination papers were already written up. (Climer Dep. 47:16-48:2).

Mr. Lebo visited Mr. Climer at his house in the last year. (Lebo Dep. 25:20-22). In Mr. Lebo's visits with Mr. Climer, the lawsuit was always mentioned. (Lebo Dep. p. 26, ll. 3-14). Mr. Lebo said he did not recall conversations with Mr. Climer regarding his termination. (Lebo Dep. 23:4-6). He did not say that the conversations did not occur. Mr. Lebo's testimony is admissible under Fed.R. Evid. 803(1) as his present sense and impression of Horseshoe's plan to terminate employees as it was in progress. It is also admissible under Fed.R. Evid. 804(a)(3) and 804(b) as statement against his interest in continued employment with Horseshoe. Mr. Rich's statements are statements by the agent of a party-opponent concerning a matter within the scope of the agency or employment.

As a supervisor, Mr. Rich was aware that Mr. Climer was out on medical leave. (Climer Dep. 52:22-53:18). Mr. Rich sent the information regarding his employee's attendance (Rich Dep. p. 22, l.18-24) and medical leave (Rich Dep. 23:1-6) to Horseshoe's human resources. Mr. Busey and the facilities director, Randy Wooten made the decision to terminate Mr. Climer. (Busey Dep. 33:20-34:7). Mr. Wooten and Tunica Regional Human Resources personnel had knowledge that Mr. Climer was out of work for a persistent injury. (Ex. G). Mr. Lee was known to have been injured and was also terminated. (Climer Dep. 69:6-11). Mr. Climer did not perceive any disability to Mr. Stovall. See Id. The noninjured and nondisabled facilities mechanics remained employed after Mr. Climer's termination. (Lebo Dep. 27:19-24)

Horseshoe's proffered legitimate, non-discrimnatory, and non-retalitory reason for terminating Mr. Climer is unsubstantiated. Horseshoe begins by asserting that Mr. Climer had a lower performance rating than Mr. Stovall who had a highly successful rating. (D.E. #53 at 263). Horseshoe asserts that Mr. Climer had a lower performance rating than Stovall who had a highly successful rating. (DE #53 at 263). Mr. Climer's performance evaluation was downgraded for a

17

discriminatory reason, his missing work for FMLA leave. (Rich Dep. 29:21-30:9, 30:11-22; <u>See</u> Climer Dep. Exs. 25-26). Had Mr. Climer not missed work, his performance trend would have continued on the previous increasing trend. (<u>See</u> Rich Dep. Exs. 2-4)(increasing performance trend). As discussed earlier in this response, Mr. Climer was not regarded as a maintenance engineering lead and was not evaluated as a maintenance engineering lead. (Rich Dep. 16:7-10, 26:22-27:10, Exs. 2-5; Byers Dep. 21:16-24). Thus, Mr. Climer was lumped into a group of the oldest employees for purposes of the reduction in force under the false pretense that he was a Lead. Had he been lumped in with non-lead maintenance engineers, there would have been younger and less senior engineers ranked against Mr. Climer (Rich Dep. 24:21-25:1; Lebo Dep. 27:12-17) for termination.

Mr. Busey could not have held an honest belief that Mr. Climer was a maintenance engineering lead at the time he made the decision to eliminate Mr. Climer's position. Even if Mr. Climer, Mr. Lee and Mr. Stovall were classified as maintenance engineering leads in Horseshoe's Human Resources Information system as Mr. Busey alleges (Busey Dep. 34:4-20, 39:24, 40:1-21), Mr. Busey review of Mr. Climer's performance should have alerted him to Mr. Climer's evaluation as a "mechanic." (Rich Dep. Exs. 2-5). Neither Mr. Busey nor Mr. Wooten did anything about the discrepancy.

<u>Conclusion</u>

As shown in Mr. Climer's response, there are multiple disputed, material and substantial facts which create questions for the jury and render summary judgment inappropriate. For these reasons, Plaintiff respectfully requests that this Court deny Defendant's Motion For Summary Judgment.

                    LEWIS THOMASON

                    /s/ Edd L. Peyton
                    Edd L. Peyton (#102103)
                    2900 One Commerce Square
                    Memphis, TN  38103
                    (901) 525-8721
                    Attorney for Plaintiff, Harry Climer

## **CERTIFICATE OF SERVICE**

I do hereby state that a copy of the above and foregoing document has been forwarded to opposing counsel via the U.S. District Court ECF system, addressed as follows:

Angie C. Davis, Esq.
Katherine M. Bogard
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
2000 First Tennessee Building
165 Madison Avenue
Memphis, TN 38103
Attorneys for Defendants

Dated this the 27th day of May, 2014.

                    /s/ Edd L. Peyton
                    Edd L. Peyton

4838-9308-2651, v.  1